UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
PHILLIP FELDER,                                      :
                                                     :
                              Plaintiff,             :
                                                     :          **OPINION AND ORDER**
               -against-                             :          10-CV-5747 (DLI)
                                                     :
MICHAEL J. ASTRUE,                                   :
Commissioner of Social Security,                     :
                                                     :
                              Defendant.             :
-----------------------------------------------------------------x

**DORA L. IRIZARRY, United States District Judge:**

On September 27, 2006, Plaintiff Philip Felder ("Plaintiff") filed an application for Social Security disability insurance benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). On January 9, 2007, these applications were denied. On October 17, 2008, Plaintiff appeared with counsel and testified at a hearing before Administrative Law Judge Marilyn P. Hoppenfeld ("ALJ"). By a decision dated April 16, 2009, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act. On October 6, 2010, the ALJ's decision became the Commissioner's final decision when the Appeals Council denied Plaintiff's request for review.

Plaintiff filed the instant appeal seeking judicial review of the denial of benefits, pursuant to 42 U.S.C. § 405(g). The Commissioner now moves for judgment on the pleadings, pursuant to Fed. R. Civ. P. 12(c), seeking affirmation of the denial of the benefits. (*See* Doc. Entry No. 13, Mem. of Law in Supp. of Def.'s Mot. for J. on the Pleadings ("Def.'s Mem.") at 1.) Plaintiff cross-moves for judgment on the pleadings, seeking reversal of the Commissioner's decision, or alternatively, remand. Plaintiff contends that the ALJ committed reversible errors in denying his claim for DIB and SSI benefits. Specifically, Plaintiff asserts that: 1) the ALJ's finding that

Plaintiff could perform the full range of sedentary work is not supported by the opinions of any physicians on record; 2) the ALJ did not evaluate Plaintiff's credibility properly; and 3) the Commissioner failed to meet his burden of establishing that there is other work in the national economy that Plaintiff could perform. (*See* Doc. Entry No. 15, Mem. of Law in Supp. of Pl.'s Mot. for J. on the Pleadings ("Pl.'s Mem.") at 1.)

For the reasons set forth below, the Commissioner's motion for judgment on the pleadings is denied, Plaintiff's motion for judgment on the pleadings is granted, and the matter is remanded for further administrative proceedings consistent with this opinion.

## BACKGROUND

**A.      Non-Medical and Self-Report Evidence**

Plaintiff was born on July 7, 1966. (R. at 32.)[1]  He completed the twelfth grade and received a certificate in nursing. (R. at 38-39.) Plaintiff has worked since he was fifteen years old. (R. at 40.) From 1997 until April 2006, Plaintiff worked as a nursing assistant at St. Luke's Hospital. (R. at 43, 142.)  As a nursing assistant, Plaintiff was required to lift patients from their beds or stretchers, frequently lift fifty pounds or more, walk/stand/handle big objects for six hours each day, sit one hour each day, stoop three hours each day, and kneel/crouch for two hours each day. (R. at 159-60.)

Plaintiff alleges he became disabled on April 14, 2006, after falling down a flight of stairs and sustaining a right bimalleolar ankle fracture/dislocation and left patella tendon rupture. (R. at 136, 186, 188.)  According to Plaintiff, his broken right ankle, left knee patella tendon rupture, and high blood pressure limit his ability to work. (R. at 141.)

---

[1] "R." citations are to the correspondingly numbered pages in the certified administrative record. (*See* Doc. Entry No. 17.)

1.      **Adult Function Report**

On October 28, 2006, Plaintiff completed an Adult Function Report.  (R. at 148-58.)
Plaintiff reported feeling an "aching pain."  (R. at 156.)  He described it as a sharp, stabbing pain
in his ankle and a stiff pain in his knee.  (*Id.*)  This pain would last for twenty to forty minutes
and worsened with walking and standing.  (R. at 157.)  According to Plaintiff, he was prescribed
Vicodin and instructed to take it as needed to relieve the pain.  (*Id.*)  He also used a cane and
wore a protective boot for his leg.  (R. at 158.)

The report indicates that all aspects of Plaintiff's life were affected by his injuries.
According to Plaintiff, his injuries prevented him from working.  (R. at 149.)  Additionally, he
was unable to stand for longer than forty-five minutes.  (*Id.*)  His ability to put on shoes and
socks was also hindered.  (*Id.*)  Plaintiff stated that, before his accident, it would take him ten
minutes to walk down the street, but presently it takes him thirty minutes.  (R. at 158.)  He also
could walk only half a block before having to stop and rest for up to six minutes.  (R. at 154.)
Plaintiff could not lift, stand, or walk for extended periods of time.  (R. at 153.)  Additionally, he
could not kneel, squat, or go up and down stairs.  (*Id.*)  Plaintiff's sleep was also affected because
keeping his leg straight resulted in stiffness.  (R. at 149.)  Plaintiff can no longer engage in
sexual activities with his girlfriend.  (R. at 153.)  Because the toilet was too low, Plaintiff had
trouble cleaning himself.  (R. at 150.)  Plaintiff spent his time going to doctor appointments and
physical therapy and resting his leg at home.  (R. at 149.)

As a result of his injuries, Plaintiff's household and parental responsibilities were also
limited.  Plaintiff had trouble washing dishes and vacuuming.  (R. at 150.)  Plaintiff used to cook
on the stove for long periods of time; now, however, the extent to which he can cook is limited
by his inability to stand for long periods of time.  (*Id.*)  According to Plaintiff, he shopped every

three weeks for thirty to forty minutes.  (R. at 152.)  He was able to pay bills and handle money. (*Id.*)  Plaintiff did not have trouble paying attention and following instructions.  (R. at 154.)

**B.**    **Medical Evidence on and After Plaintiff's Alleged Onset Date of April 14, 2006**

Plaintiff received in-patient treatment at Jamaica Hospital Medical Center from April 14, 2006 until May 16, 2006.  (R. at 180-232.)  X-rays taken throughout the course of the morning of April 14, 2006 revealed a fracture of the distal fibula and mild asymmetry of the ankle mortise with marked widening medially.  (R. at 182, 184.)  On April 17, 2006, Plaintiff underwent an open reduction and internal fixation ("ORIF") of the right ankle fracture dislocation by means of plate and screws, and surgery to correct the left patella tendon repair.  (R. at 186.)  Later that day, an X-ray of the right ankle showed an orthopedic splint stabilizing a distal right fibula fracture; the fracture alignment appeared satisfactory.  (R. at 181.)  There was also "widening of the medial aspect of the ankle mortise clear space."  (*Id.*)

Medical reports from May 4, 2006 to May 6, 2006 documented Plaintiff's status after surgery.  On May 4, 2006, Plaintiff had a Bledsoe brace in place.  (R. at 192.)  An X-ray of the right ankle revealed an orthopedic plate and screws bridging the distal fibula with two screws bridging the tibia and fibula.  (R. at 180.)  Anatomic alignment was well maintained and there appeared to be no acute bone pathology.  (*Id.*)  Plaintiff denied having any pain.  (R. at 192.) Progress notes documented Plaintiff's history of hypertension and non-obstructive coronary artery disease.  (*Id.*)  On May 5, 2006, Plaintiff weighed 280 pounds and his nutrition risk level was low.  (R. at 194.)  Plaintiff was described as obese.  (R. at 191.)  On May 6, 2006, Plaintiff had difficulty walking.  (*Id.*)

1.     **Treating Physician**

While at Jamaica Hospital Medical Center, Plaintiff also received physical and occupational therapy from Dr. Svetlana Gavrilova, his treating physician.  (R. at 215-27.)  On May 8, 2006, Plaintiff's right ankle strength was 5/10, and his left knee strength was 5/10.  (R. at 215.)  Plaintiff experienced pain in his right ankle and left knee and used a rolling walker.  (R. at 215-16.)  Progress notes from May 9, 2006 indicate that Plaintiff complained of left ankle pain and left foot swelling.  (R. at 203.)  On May 11, 2006, Plaintiff's blood pressure was 110/60, he was not ambulating much, and had difficulty walking.  (R. at 206-07.)  On May 13, 2006, Plaintiff's left foot experienced swelling, but on May 15, 2006, Plaintiff was "doing well."  (R. at 210-11.)

On May 16, 2006, Plaintiff was discharged in "optimal physical health."  (R. at 214.)  At this time, Plaintiff was two-touch weight bearing to the left lower extremity and weight bearing as tolerated to the right extremity.  (R. at 186.)  His range of motion in the right lower extremity was normal.  (*Id.*)  Plaintiff had full strength, 5/5, in his upper extremities; his lower extremities could not be assessed due to his cast.  (*Id.*)  Upon discharge, Plaintiff was taking Prevacid, Senna, Colace, Cozaar, a multivitamin, and Vicodin.  (*Id.*)  Plaintiff was instructed to follow-up with the Orthopedic Clinic and the Rehabilitation Clinic.  (*Id.*)  When Plaintiff returned on May 23, 2006, his left leg wound had healed.  (R. at 232.)  Dr. Gavrilova instructed Plaintiff to continue therapy and scheduled a follow up visit in one month.  (*Id.*)

On June 16, 2006, Plaintiff complained of pain in his right ankle and left knee.  (R. at 264-65.)  Plaintiff had full muscle strength, 5/5, in his upper extremities.  (*Id.*)  Plaintiff's strength in his lower extremities was -4/5, and strength in his left knee was 3-/5.  (*Id.*)  His deep

tendon reflexes were 1+ and equal, and sensation was intact. (*Id.*) Dr. Gavrilova filled out a disability form for Plaintiff and prescribed him Vicodin for pain. (*Id.*)

Dr. Gavrilova's progress notes from June 27, 2006 indicate that Plaintiff's left knee incision was well healed, and his right ankle fracture was healing. (R. at 230.) Dr. Gavrilova's notes from July 25, 2006 indicate that Plaintiff was experiencing right ankle and left knee pain, and having difficulty walking. (R. at 262.) Plaintiff complained that his right ankle pain was worse at the end of the day. (*Id.*) After she performed a physical examination, Dr. Gavrilova confirmed there was swelling in both of Plaintiff's legs. (R. at 263.) Plaintiff had reduced strength in his right ankle at 4/5 and his left knee at 4/5. (*Id.*) Dorsiflexion of the right ankle was to 90 degrees and plantar flexion was to 10 degrees. (*Id.*) Left knee active range of motion was to 35 degrees and passive range of motion was to 40 degrees, with pain. (*Id.*) Plaintiff ambulated with crutches. (*Id.*)

On August 4, 2006, Dr. Gavrilova completed a Medical Substantiation/Proof of Illness Form for Plaintiff's employer. (R. at 267-69.) Plaintiff's diagnosis was listed as a right ankle fracture and left patella tendon rupture. (R. at 268.) Plaintiff's complaints of right ankle and left knee pain were documented, as well as his difficulty walking. (*Id.*) According to Dr. Gavrilova, Plaintiff could return to "light duty" work on approximately October 14, 2006. (R. at 269.) However, Plaintiff needed rest to elevate his right lower extremity to decrease edema and was to avoid prolonged standing and walking. (*Id.*) Dr. Gavrilova noted that Plaintiff reported he was incapable of either bending with flexed knees or kneeling. (R. at 269.)

From August 25, 2006 until August 29, 2006, Plaintiff continued to have pain. (R. at 260.) Plaintiff reported having left knee stiffness with a decrease in range of motion, right ankle pain and swelling, and trouble walking. (*Id.*) Dr. Gavrilova confirmed Plaintiff had swelling in

his right ankle.  (*Id.*)  She continued Plaintiff on Vicodin.  (*Id.*)  By August 29, 2006, Plaintiff was morbidly obese, weighing 330 pounds.  (R. at 229.)  His blood pressure was 140/90.  (*Id.*)  Plaintiff continued to have pain while walking on his right ankle.  (*Id.*)  On examination, his right ankle had a limited range of motion with increased pain and 4/5 strength, and sensation was intact.  (*Id.*)  Plaintiff's left knee had full strength, 5/5, range of motion to 70 degrees, and sensation intact.  (*Id.*)  Plaintiff was instructed to continue physical and occupational therapy.  (R. at 229.)

On September 19, 2006, Plaintiff still complained of right knee stiffness and right ankle swelling.  (R. at 258.)  He was not using any kind of assistive device for mobility.  (*Id.*)  Flexion/extension of the left knee was to 75 degrees.  (R. at 259.)  Dorsiflexion of the right ankle was to 0 degrees and plantar flexion was to 20 degrees.  (*Id.*)  Dr. Gavrilova advised Plaintiff to continue taking his medication and attending physical therapy twice a week.  (R. at 234, 258.)  According to Dr. Gavrilova, Plaintiff could return to work on October 16, 2006, provided he did not bend his knees/ankles, stand or walk for prolonged periods of time, and rest with his right leg elevated to decrease edema.  (*Id.*)  Dr. Gavrilova also noted that she filled out several disability applications for Plaintiff.  (R. at 258.)

On October 17, 2006, Dr. Gavrilova examined Plaintiff.  (R. at 256-57.)  Plaintiff had right ankle edema.  (R. at 257.)  Dorsiflexion of the right ankle was to 20 degrees and plantar flexion to 10 degrees.  (*Id.*)  Flexion/extension of the left knee was to 85 degrees.  (*Id.*)  Dr. Gavrilova continued Plaintiff on Vicodin.  (R. at 256.)  Dr. Gavrilova also provided Plaintiff with a work letter addressed to "To Whom It May Concern" stating that, "Inasmuch as there is no light duty work on the job, and his symptoms persist as a result of the injuries he sustained, he will be unable to perform full duty work and needs to go back to physical therapy."  (R. at 255.)

She also included Plaintiff's complaints of pain in his left knee and right ankle in the letter.  (*Id.*)

When Plaintiff saw Dr. Gavrilova again on November 14, 2006, he still complained of left knee stiffness and continued to take Vicodin.  (R. at 253.)  On examination, Plaintiff's left knee range of motion was to 85 degrees.  (R. at 254.)  His right ankle was to 0 degrees.  (*Id.*)  Muscle strength in his left knee and right ankle was 5-/5.  (*Id.*)  Plaintiff claimed he was unable to do his previous work but wanted to get into a "program."[2]  (*Id.*)

### 2.    Consultative Examination

The Division of Disability Determination referred Plaintiff for an internal medicine examination.  Accordingly, on December 18, 2006, Plaintiff was examined by Dr. Marilee Mescon, a consultative internal medicine physician at Industrial Medicine Associates, P.C.  (R. at 238-42.)  Plaintiff's basis for requesting disability benefits was hypertension, and left knee and right ankle pain.  (R. at 238.)  However, Dr. Mescon's notes indicated that Vicodin relieved Plaintiff's left knee and right ankle pain.  (*Id.*)  Plaintiff also was taking Arthrotec and Hydrocodone.  (*Id.*)  Dr. Mescon stated that Plaintiff could "cook, shop, clean, do the laundry, shower, bathe, and dress by himself."  (*Id.*)  Upon a physical examination, Dr. Mescon observed that Plaintiff had difficulty walking on his toes, especially on his right foot, and he could only squat one-quarter of the way down.  (R. at 239.)  However, according to Dr. Mescon, Plaintiff's gait was normal.  (*Id.*)  Dr. Mescon also noted that Plaintiff did not require help going from a seated to a standing position, getting on and off the exam table, and undressing or dressing.  (*Id.*)  According to Dr. Mescon's records, Plaintiff was not using an assistive device to ambulate at the time of her examination and he weighed 343 pounds without shoes.  (*Id.*)

---

[2] It is not clear from Dr. Gavrilova's notes what kind of program Plaintiff wanted to join.

Dr. Mescon also examined Plaintiff's musculoskeletal system.  (R. at 240.)  Plaintiff had 5/5 strength in his upper and lower extremities.  (*Id.*)  Plaintiff's joints were stable and nontender.  (*Id.*)  Flexion/extension of the left knee was to 90 degrees, dorsiflexion of the right ankle was to 15 degrees, and dorsiflexion of the left ankle was to 20 degrees.  (*Id.*)  Plantar flexion was to 35 degrees in Plaintiff's right ankle and to 80 degrees in his left ankle.  (*Id.*)  His grip strength was 5/5.  (*Id.*)  There was 2+ bilateral pitting edema in both lower extremities but there was no evidence of muscle atrophy.  (*Id.*)  Plaintiff's neurological functions were normal. (*Id.*)  X-rays of Plaintiff's left knee indicated moderate osteoarthritic changes.  (R. at 240-42.) X-rays of his right ankle showed ORIF hardware at the distal fibula, but otherwise it was an unremarkable examination of the right ankle mortise.  (*Id.*)

Based on her findings from the physical examination she performed and based on Plaintiff's history, Dr. Mescon found the following:

> [T]here are no objective findings to support the fact that the claimant would be restricted in his ability to sit or stand for short periods of time, but his capacity to climb, push, pull or carry heavy objects would probably be moderately restricted because of residual left knee and right ankle pain.

(R. at 241.)  According to Dr. Mescon, Plaintiff had a history of left knee and right ankle fracture, and high blood pressure under good medical management.  (*Id.*)  Despite Dr. Mescon's diagnosis, Plaintiff's long-term prognosis was "fair."  (*Id.*)

**3.      Disability Examiner**

R. Barrett, a disability examiner, completed a Physical Residual Functional Capacity Assessment ("RFC") of Plaintiff on December 26, 2006.  (R. at 243-48.)[3]  Barrett indicated that

---

[3] The ALJ did not introduce this RFC assessment into evidence given that it was completed by a disability examiner, and not a physician.  (R. at 26-27.)  In rendering a disability determination,

Plaintiff was capable of frequently lifting and/or carrying ten pounds; occasionally lifting and/or carrying twenty pounds; standing and/or walking for a total of about six hours in an eight-hour workday; sitting for about six hours in an eight-hour workday; and pushing and/or pulling with limitations in his upper and lower extremities.  (R. at 244.)  According to Barrett, Plaintiff had an RFC for light work.  (R. at 245.)

### 4.      Follow up Treatments with Dr. Gavrilova

When Plaintiff saw Dr. Gavrilova on January 19, 2007, his primary complaint was right ankle pain and swelling, and stiffness in his left knee with decreased range of motion.  (R. at 250.)  Dr. Gavrilova examined Plaintiff and found minimal right ankle swelling.  (R. at 251.)  Dr. Gavrilova's diagnosis remained the same: left patella tendon rupture repair and right ankle ORIF. (R. at 250.)  She continued to prescribe Vicodin.  (*Id.*)  Dr. Gavrilova also noted that Plaintiff wanted to start work on January 23, 2007 and attend training.  (*Id.*)  Subsequently, Dr. Gavrilova wrote another letter addressed to "To Whom It May Concern" regarding Plaintiff's ability to work.  (R. at 252.)  The letter stated that Plaintiff may restart his work on January 23, 2007, but also that Plaintiff "may benefit from decreased standing activities or given rest periods for right lower extremity."  (*Id.*)

X-rays of Plaintiff's ankles obtained on September 25, 2008 at Queens-Long Island Medical Group, P.C. revealed a fracture of the fourth screw and dislocation of the fifth screw in Plaintiff's right ankle.  (R. at 270.)  There was no acute fracture, the ankle mortise was preserved, and the soft tissues were unremarkable.  (*Id.*)  Impressions of the left ankle were unremarkable.  (*Id.*)  X-rays of the left knee were unremarkable; there was no fracture or

_____

the ALJ may disregard any evidence from a source not listed in 20 C.F.R. § 404.1513.  *See Duran v. Comm'r of Soc. Sec.*, 296 Fed. App'x. 134, 136 (2d Cir. 2008).

dislocation.  (*Id.*)  The joint spaces were preserved.  (*Id.*)  There was no joint effusion, and the soft tissues were unremarkable.  (*Id.*)

## C.    Hearing Testimony

On October 17, 2008, Plaintiff appeared with counsel and testified before the ALJ to review his disability claim.  (R. at 22-81.)  At the disability hearing, Plaintiff stated that he is six foot one and currently weighs between 280-287 pounds.  (R. at 32-33.)  According to Plaintiff, he has gained 60 pounds since 2006 due to inactivity from his injuries.  (*Id.*)  Plaintiff testified that "every now and then" he drives locally, but otherwise his son drives him.  (R. at 34.)  Plaintiff, however, drove to the hearing.  (R. at 35.)  Plaintiff also stated that he is unable to take public transportation because of his inability to walk up and down stairs.  (*Id.*)

Plaintiff moved to a new home with no stairs because of this inability.  (R. at 78-79.)  Plaintiff lives with his twenty-year-old son and a roommate.  (R. at 29, 36.)  Plaintiff testified that his son helps care for Plaintiff's one-year-old child as much as he can and is home with Plaintiff most of the time.  (R. at 69-70.)  Plaintiff testified that he does not bathe the child and could not lift her up.  (*Id.*)  According to the Plaintiff, he does not even help with "light cleaning" because he is unable to stand for too long.  (R. at 71.)  When asked whether he bathed himself, Plaintiff testified that he could do so because he has a walk-in shower.  (R. at 79.)

Plaintiff testified that on April 14, 2006, he fell down a flight of stairs, breaking his right ankle and dislocating his left kneecap.  (R. at 45.)  Plaintiff was admitted to Jamaica Hospital Medical Center that same day, where doctors reattached and restructured the kneecap.  (R. at 46.)  On April 15, 2006, doctors performed open reduction surgery on his ankle.  (*Id.*)  Plaintiff remained at Jamaica Hospital for the approximately two or three months, where he received therapy for his ankle.  (R. at 46-47.)  During this time, Plaintiff wore a full cast and used a

walker.  (R. at 47.)  Plaintiff was discharged wearing a cast from his waist to his ankle.  (R. at 49.)  Approximately one month after discharge, Plaintiff's cast was removed, and he utilized crutches.  (R. at 51-52.)  After two to three months, Plaintiff switched to using a four-point cane and then to an adjustable cane that the hospital gave him.  (R. at 52, 54.)  During this time, a visiting nurse came to Plaintiff's home to assist him in showering and using the bathroom.  (R. at 53.)  Plaintiff is currently using a wood cane that, according to Plaintiff, was prescribed to him by a doctor.  (R. at 55.)

Plaintiff testified that he was scheduled to return to the hospital to have the hardware taken out of his ankle on December 9, 2008.  (R. at 55-56.)  An individual identified as Dr. Radnay, an orthopedist at Rochdale Village Medical Office, was scheduled to perform the surgery.  (R. at 57-58.)  Plaintiff testified that there is no hardware in his knee but there is bone union.  (R. at 56.)  Plaintiff has developed arthritis in the knee.  (*Id.*)  Plaintiff experiences pain, but he had not yet received injections for his knee.  (*Id.*)

Plaintiff testified that he was examined by Dr. Radnay on September 25, 2008.[4]  (R. at 59.)  Plaintiff testified that Dr. Radnay only treated him once prior to the hearing because Plaintiff had only recently acquired insurance.  (*Id.*)  X-rays taken of Plaintiff's knee and ankles showed no joint diffusion, joint spaces were preserved, and nothing unremarkable about the knee.  (*Id.*)  At this time, Plaintiff's attorney clarified that Plaintiff's knee was not the problem; rather, the issue was the dislocation of one of the screws in Plaintiff's ankle.  (R. at 60.)  The ALJ noted that the real inquiry is whether the bones in the ankle calcified and united.  (*Id.*)

---

[4]  Because Dr. Radnay only recently began treating Plaintiff, no records of Dr. Radnay's examinations had been provided to the ALJ.  The ALJ asked Plaintiff's attorney whether he thought the records from that visit were needed and Plaintiff's attorney informed the ALJ that he would obtain the records.  (R. at 59.)

Plaintiff testified that he is unable to walk an entire block without stopping to rest because he can feel the loose screw that is broken in his ankle, and his leg is "really swelling up on it." (R. at 61.) According to Plaintiff, Dr. Radnay saw the swelling when he examined Plaintiff. (R. at 59, 62.) The ALJ ordered Plaintiff's attorney to get a report that had been prepared by Dr. Radnay, and also stated, "an RFC would help." (R. at 62-63.)

The ALJ then asked Plaintiff about his ability to stand, bend, kneel, sit, and lift about ten pounds. (R. at 64-65.) Plaintiff testified that he is unable to stand for longer than forty-five minutes. (R. at 64.) When Plaintiff stated that his knees prevent him from bending, the ALJ asked him whether he could pick something up if it dropped on the floor. (*Id.*) Plaintiff stated that he would have to sit down to pick it up, and upon the ALJ's inquiry, Plaintiff confirmed that he is unable to squat or kneel. (*Id.*) Plaintiff stated he could sit for up to an hour but "every now and then" he needs to stretch his ankle, knees, and legs before sitting again. (R. at 64-65.) However, Plaintiff could lift a ten pound object without trouble. (R. at 65.)

The ALJ also reviewed the report from Dr. Mescon, the consulting internal medicine physician Plaintiff was referred to by the Division of Disability Determination, and asked Plaintiff about his hypertension. (*Id.*) Plaintiff testified that he was diagnosed with hypertension four or five years ago and is prescribed medication. (*Id.*) Plaintiff also testified that he takes Vicodin and Arthrotec for the pain in his leg. (R. at 66.) At the time Dr. Mescon examined Plaintiff, Plaintiff's blood pressure was 130/100 and "under good medical management." (R. at 67.) Since Plaintiff could not remember the exact medication he takes, the ALJ ordered him to submit a pharmacy printout. (R. at 65.)

Before the close of the hearing, Plaintiff's attorney questioned Plaintiff regarding his consultation with Dr. Mescon. (R. at 73.) Plaintiff testified that at the time of this examination

he was using a four-point cane.  (*Id.*)  According to Plaintiff, Dr. Mescon helped him get on and off the exam table and take off his shoes.  (*Id.*)  Plaintiff clarified that his son regularly tied his shoes for him in the morning.  (*Id.*)  When asked by the ALJ if he notices any swelling in his legs, Plaintiff testified that he sees swelling in his right ankle, and his left knee is a little larger than his right.  (R. at 76.)  At the close of the hearing, the ALJ reiterated her request for a report from Dr. Radnay with an RFC, if possible, as well as a pharmaceutical printout from the Plaintiff.  (R. at 79.)  Nothing in the record indicates that the requested documents were either provided to the ALJ or relied on by her in rendering her decision.

## DISCUSSION

## I.    Standard of Review

Unsuccessful claimants for disability benefits under the Act may bring an action in federal district court seeking judicial review of the Commissioner's denial of their benefits "within sixty days after the mailing . . . of notice of such decision or within such further time as the Commissioner of Social Security may allow."  42 U.S.C. §§ 405(g), 1383(c)(3).  A district court, reviewing the final determination of the Commissioner, must determine whether the correct legal standards were applied and whether substantial evidence supports the decision.  *See Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998).  The former determination requires the court to ask whether "the claimant has had a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the Act."  *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982) (internal quotations omitted).  The latter determination requires the court to ask whether the decision is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

The district court is empowered "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  A remand by the court for further proceedings is appropriate when "the Commissioner has failed to provide a full and fair hearing, to make explicit findings, or to have correctly applied the . . . regulations." *Manago v. Barnhart*, 321 F. Supp. 2d 559, 568 (E.D.N.Y. 2004).   A remand to the Commissioner is also appropriate "[w]here there are gaps in the administrative record." *Rosa v. Callahan,* 168 F.3d 72, 83 (2d Cir. 1999) (quoting *Sobolewski v. Apfel*, 985 F. Supp. 300, 314 (E.D.N.Y. 1997)).  ALJs, unlike judges, have a duty to "affirmatively develop the record in light of the essentially non-adversarial nature of the benefits proceedings." *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999).

## II.     Disability Claims

To receive disability benefits, claimants must be "disabled" within the meaning of the Act.  *See* 42 U.S.C. § 423(a), (d).  Claimants establish disability status by demonstrating an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The claimant bears the initial burden of proof on disability status and is required to demonstrate disability status by presenting "medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques," as well as any other evidence the Commissioner may require.  42 U.S.C. § 423(d)(5)(A); *see also Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983).

ALJs must adhere to a five-step inquiry to determine whether a claimant is disabled under the Social Security Act as set forth in 20 C.F.R. § 404.1520.  If at any step the ALJ finds that the claimant is either disabled or not disabled, the inquiry ends there.  First, the claimant is not disabled if he or she is working and performing "substantial gainful activity."  20 C.F.R. § 404.1520(b).  Second, the ALJ considers whether the claimant has a "severe impairment," without reference to age, education or work experience.  Impairments are "severe" when they significantly limit a claimant's physical or mental "ability to conduct basic work activities."  20 C.F.R. § 404.1520(c).  Third, the ALJ will find the claimant disabled if his or her impairment meets or equals an impairment listed in Appendix 1.  *See* 20 C.F.R. § 404.1520(d); 20 C.F.R. pt. 404, subpt. P, app. 1.

If the claimant does not have a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity ("RFC") in steps four and five.  20 C.F.R. § 404.1520(e).  In the fourth step, the claimant is not disabled if he or she is able to perform "past relevant work."  20 C.F.R. § 404.1520(e).  Finally, in the fifth step, the ALJ determines whether the claimant could adjust to other work existing in the national economy, considering factors such as age, education, and work experience.  If so, the claimant is not disabled.  20 C.F.R. § 404.1520(f).  At this fifth step, the burden shifts to the Commissioner to demonstrate that the claimant could perform other work.  *See Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002) (citing *Carroll*, 705 F.2d at 642).

## III.    ALJ's Decision

The ALJ adhered to the five-step procedure and determined that Plaintiff is not disabled. (R. at 15-20.)  The ALJ concluded that the first and second steps were met.  (R. at 15.)  First, the ALJ found no proof that Plaintiff engaged in any substantial gainful activity since April 14,

2006, the date he allegedly became disabled.  (*Id.*)  Second, the ALJ held that Plaintiff's status post right ankle fracture/dislocation, status post left patella tendon rupture, and high blood pressure, under fair control with medication, qualified as medically severe impairments.  (*Id.*)  At step three, the ALJ determined that Plaintiff's impairments, individually or combined, did not meet one of the impairments listed in Appendix 1.  (R. at 16.)

At step four, the ALJ found Plaintiff had the RFC for the full range of sedentary work and that Plaintiff's impairments did prevent him from performing his past relevant work as a nursing assistant and housekeeper.  (R. at 16-19.)  In determining Plaintiff's RFC, the ALJ gave "great weight" to Dr. Gavrilova's opinion and objective clinical findings, including X-ray findings.  (R. at 19.)  The ALJ concluded that Dr. Mescon's opinion regarding Plaintiff's ability to sit and walk, while considered, were not "supported by the objective evidence and appear[ed] to be based upon claimant's history and complaints."  (*Id.*)  The ALJ also acknowledged that Plaintiff has residual limitations, but determined Plaintiff retained his ability to perform a full range of sedentary work.  (*Id.*)

In addition, the ALJ found that, although Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, Plaintiff's statements concerning the intensity, persistence, and limiting effects of the symptoms were not credible.  (R. at 17.) Specifically, the ALJ addressed Plaintiff's activities and concluded that Plaintiff is capable of performing "at least sedentary work."  (R. at 19.)  The ALJ specifically stated:

> Claimant drove locally; helped with shopping, cleaning and took care of a one year old baby, while the mother went to work, although he stated he did not pick up the child.  He is able to dress, bathe and take care of his personal needs without assistance.

(*Id.*)

Finally, at the fifth step, the ALJ determined that Plaintiff could successfully adjust to

other available work in the national economy.  (R. at 20.)  To make this determination, the ALJ relied on the Medical-Vocational Guidelines, 20 C.F.R. pt. 404, subpt. P, app. 2.  Accordingly, the ALJ concluded that Plaintiff was not disabled under the Act.  (*Id.*)

As set forth in more detail below, the ALJ failed to meet her affirmative duty to develop the administrative record in order to make a well informed RFC determination.  Moreover, the ALJ failed to address all of the relevant factors and consider the entire administrative record with respect to assessing Plaintiff's credibility.  Finally, the ALJ failed to obtain relevant evidence to support the conclusion that there are other jobs in the national economy Plaintiff could perform. Accordingly, this matter must be remanded for further proceedings consistent with this opinion.

## IV.    Analysis

### A.       Duty to Develop Record

Plaintiff argues that the ALJ's RFC determination that Plaintiff can perform the full range of sedentary work is not supported by substantial evidence and the ALJ erred in reaching the RFC determination without first developing the record by obtaining updated reports regarding Plaintiff's functional limitations from either Plaintiff's treating physician, Dr. Gavrilova, or Plaintiff's consulting physician, Dr. Mescon.  (*See* Pl.'s Mem. at 9-14.)  The Commissioner contends that there are objective findings in the record that support the ALJ's RFC determination, in addition to Dr. Gavrilova's and Dr. Mescon's medical opinions.  (*See* Def.'s Mem. at 17-20.)  The Court agrees with Plaintiff and finds that the ALJ committed error in making an RFC determination in the absence of an adequate supporting medical opinion.

"It is a well-settled rule in the Second Circuit that the Commissioner must affirmatively develop the administrative record due to the essentially non-adversarial nature of a benefits proceeding."  *Garcia v. Apfel*, No. 98 CIV. 1370 RLC, 1999 WL 1059968, at *5 (S.D.N.Y. Nov.

19, 1999) (citing *Pratts v. Chater*, 94 F.3d 34, 37 (2d. Cir. 1996)).  The ALJ's duty to develop the record includes ensuring that the record as a whole is complete and detailed enough to allow the ALJ to determine the claimant's RFC.  *Casino-Ortiz v. Astrue*, No. 06 Civ. 0155 (DAB)(JCF), 2007 WL 2745704, at *7 (S.D.N.Y. Sept. 21, 2007), *report and recommendation adopted by* 2008 WL 461375 (S.D.N.Y. Feb. 20, 2008).  The absence of an RFC statement from the record does not necessarily make the record incomplete.  *Id.* at *8 (citing 20 C.F.R. § 404.1513(b)(6)).  However, where an RFC is lacking, the Commissioner must take the affirmative step of requesting one before making a disability determination.  *Johnson v. Astrue*, 811 F. Supp. 2d 618, 629 (E.D.N.Y. 2011) (citing *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996)).  In other words, the Commissioner has an affirmative duty to request RFC assessments from a plaintiff's treating sources despite what is otherwise a complete medical history.  *Johnson*, 811 F. Supp. 2d at 630 (citation omitted).

An RFC determination indicates the most an individual still can do despite his or her impairments.  *See* 20 C.F.R. § 404.1545(a).  An individual's RFC takes into consideration their physical and mental limitations, symptoms, including pain, and all other relevant evidence in the case record.  *Id.*  Specifically, with respect to physical abilities, the RFC assessment includes consideration of an individual's exertional capabilities, including his or her ability to sit, stand, walk, lift, carry, push, and pull.  20 C.F.R § 404.1545(b).  Non-exertional limitations or restrictions, including manipulative or postural limitations, such as reaching, handling, stooping, or crouching, are also considered.  *Id.*

Here, the ALJ did not consult an RFC assessment from a medical physician or source when making findings concerning Plaintiff's capacity to perform a full range of sedentary work.  Although an RFC assessment previously had been completed by a disability examiner, the ALJ

19

did not admit that assessment into evidence.  (R. at 26-27.)  Additionally, although the ALJ noted

that an RFC assessment by Dr. Radnay would be helpful in making her findings (R. at 63), the

ALJ's findings do not refer to or rely on any statements or assessments by Dr. Radnay.

In the absence of an RFC assessment, the ALJ nonetheless concluded that Plaintiff

"retained the residual functional capacity to perform a full range of sedentary work."  (R. at 16.)

"Sedentary work" consists of the following:

> The ability to perform the full range of sedentary work requires the
> ability to lift no more than 10 pounds at a time and occasionally to
> lift or carry articles like docket files, ledgers, and small tools.
> Although a sedentary job is defined as one that involves sitting, a
> certain amount of walking and standing is often necessary in
> carrying out job duties.  Jobs are sedentary if walking and standing
> are required occasionally and other sedentary criteria are met.
> "Occasionally" means occurring from very little up to one- third of
> the time, and would generally total no more than about 2 hours of
> an 8-hour workday. Sitting would generally total about 6 hours of
> an 8-hour workday. Unskilled sedentary work also involves other
> activities, classified as "nonexertional," such as capacities for
> seeing, manipulation, and understanding, remembering, and
> carrying out simple instructions.

SSR 96-9p, 1996 WL 374185 (July 2, 1996).  Here, the ALJ concluded that Plaintiff was and is

able to sit for six hours in an eight-hour day, stand and walk for two hours in an eight-hour day,

and lift ten pounds occasionally.  (R. at 16-17.)

Although the ALJ accorded "[g]reat weight" to the records of Dr. Gavrilova in reaching

this conclusion (R. at 19), those records did not provide enough information for the ALJ to infer

that Plaintiff could perform sedentary work.   As the Commissioner notes, Dr. Gavrilova

observed in August and September 2006 that Plaintiff could return to light duty work by October

17, 2006, provided, however, that the work did not require prolonged standing or walking, and

further, that Plaintiff could elevate his right leg as needed.  (Def.'s Mem. at 20 (citing R. at 258,

268-69).)   Additionally, at that time, Dr. Gavrilova noted that Plaintiff's work limitations

20

included a need to elevate his leg to reduce swelling and to refrain from kneeling or bending with his knees and ankles.  (R. at 234, 258, 269.)  Although a January 2007 note from Dr. Gavrilova stated that Plaintiff may return to work on January 23, 2007, that note did not specify any type of work Plaintiff could perform, and it also indicated that Plaintiff would benefit from decreased standing and rest periods for the right lower extremity.  (R. at 252.)  Dr. Gavrilova did not provide further opinions or specificity concerning the scope of Plaintiff's work-related capabilities, and, as such, her findings do not provide a proper basis for the ALJ's finding that Plaintiff can perform sedentary work.  *See Woodford v. Apfel*, 93 F. Supp. 2d 521, 529 (S.D.N.Y. 2000) ("An ALJ commits legal error when he makes a residual functional capacity determination based on medical reports that do not specifically explain the scope of claimant's work-related capabilities.") (citation omitted); *Sobolewski*, 985 F. Supp. at 314 ("[T]he burden of proof is on the Commissioner to offer positive evidence that plaintiff can perform sedentary work, and the burden is not carried merely by pointing to evidence that is consistent with his otherwise unsupported assertion.") (citation omitted).

Similarly, Dr. Mescon did not opine with requisite specificity on Plaintiff's ability to perform sedentary work.[2]  Dr. Mescon specifically stated the following:

> On the basis of the history and physical just performed, there are no objective findings to support the fact that the claimant was restricted in his ability to sit or stand for short periods of time, but his capacity to climb, push, pull, or carry heavy objects would probably be moderately restricted because of residual left knee and right ankle pain.

(R. at 241.)

---

[2] The ALJ "considered" the opinion of Dr. Mescon, but ultimately found that it was not supported in regards to sitting and walking.  (R. at 19.)

Although Dr. Mescon provided some information as to Plaintiff's ability to sit, stand, climb, push, pull, or carry on December 18, 2006, "vague statement[s] cannot serve as an adequate basis for determining [a] [p]laintiff's RFC." *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 347-48 (E.D.N.Y. 2010) (finding that physician's statement that plaintiff had "limitations of a mild degree of lifting, bending, walking, and pushing and pulling on arm controls," did not provide adequate basis for ALJ to determine that plaintiff was capable of sedentary work).

Because an RFC determination is a medical determination, an ALJ who makes an RFC determination in the absence of a supporting expert medical opinion has improperly substituted his own opinion for that of a physician, and has committed legal error. *Id.* at 347. Accordingly, upon remand, the ALJ is to develop the record so as to adequately determine Plaintiff's RFC.

**B.      Plaintiff's Credibility**

Plaintiff argues that the ALJ's credibility finding regarding Plaintiff's subjective statements about the severity and intensity of his pain is not supported by substantial evidence and the ALJ failed to apply the seven factors set forth in 20 C.F.R. § 404.1529 when making her credibility determination. (Pl.'s Mem. at 14-18.) The Commissioner asserts the ALJ reasonably concluded that Plaintiff's testimony was not credible. (Def.'s Mem. at 20-22.) The Court finds the ALJ erred when she failed to properly apply the required seven factors set forth in 20 C.F.R. § 404.1529 in making her credibility determination. Accordingly, the matter also is remanded with instruction to conduct a new credibility determination.

Subjective allegations of pain may serve as a basis for establishing disability. *Taylor v. Barnhart*, 83 F. App'x 347, 350 (2d Cir. 2003) (citation omitted). While the ALJ is required to take into consideration the claimant's allegations of pain, the ALJ is not required to accept the

claimant's subjective complaints of pain without question. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citations omitted).  Rather, the ALJ is afforded discretion in weighing the claimant's credibility in light of all the other evidence in the record. *Id.*  The regulations require the ALJ to adhere to a two-step inquiry for evaluating a claimant's subjective allegations of pain. *Peck v. Astrue*, No. 07–CV–3762 (NGG), 2010 WL 3125950, at *4 (E.D.N.Y. Aug. 6, 2010) (citing SSR 96-7p, 1996 WL 374186; 20 C.F.R. § 404.1529(c)).  First, the ALJ must consider whether there is a medically determinable impairment that could reasonably be expected to produce the pain or symptoms alleged. *Id.*  Second, the ALJ must evaluate the intensity and persistence of the individual's symptoms considering all of the available evidence. *Id.*

Where the ALJ finds that the claimant's testimony is not consistent with the objective medical evidence, the ALJ must evaluate the claimant's testimony in light of seven factors: 1) the claimant's daily activities; 2) the location, duration, frequency, and intensity of the pain; 3) precipitating and aggravating factors; 4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate the pain; 5) any treatment, other than medication, that the claimant has received; 6) any other measures that the claimant employs to relieve the pain; and 7) other factors concerning the claimant's functional limitations and restrictions as a result of the pain. 20 C.F.R. § 404.1529(c)(3)(i)-(vii).  Moreover, "[i]f the ALJ rejects plaintiff's testimony after considering the objective medical evidence and any other factors deemed relevant, he must explain that decision with sufficient specificity to permit a reviewing court to decide whether there are legitimate reasons for the ALJ's disbelief." *Correale-Englehart v. Astrue*, 687 F. Supp. 2d 396, 435 (S.D.N.Y. 2010) (citations omitted).  Where the ALJ neglects to explain a credibility determination with sufficient specificity, remand is appropriate. *See id.* at 435-36 (citing

*Hardhardt v. Astrue*, No. 05-CV-2229 (DRH), 2008 WL 2244995, at *10-11 (E.D.N.Y. May 29, 2008); *Knapp v. Apfel*, 11 F. Supp. 2d 235, 238 (N.D.N.Y. 1998)).

In determining Plaintiff's credibility, the ALJ adhered to the two-step inquiry.  First, the ALJ determined that Plaintiff's medically determinable impairments could reasonably be expected to cause his alleged symptoms.  (R. at 17.)  Next, the ALJ determined that the Plaintiff's statements regarding the intensity, persistence, and limiting effects of his symptoms were not credible "to the extent they [were] inconsistent with the . . . residual functional capacity assessment."  (*Id.*)

In assessing the first factor set forth in 20 C.F.R. § 404.1529(c)(3), the ALJ noted:

> [Plaintiff] drove locally; helped with shopping, cleaning and took care of a one year old baby, while the mother went to work, although he stated he did not pick up the child.  He is able to dress, bathe and take care of his personal needs without assistance.

(R. at 19.)  The ALJ concluded that these activities were consistent with an ability to perform "at least" sedentary work.  (*Id.*)  In what appears to be the ALJ's assessment of the second factor, the ALJ noted but rejected Plaintiff's allegations of pain and swelling and referenced various medical findings.  (R. at 17-18.)  The ALJ's decision does not appear to address the third factor.  Regarding the fourth factor, the ALJ mentioned Plaintiff's use of Vicodin, (R. at 18), and at the hearing the ALJ did request a pharmaceutical printout of Plaintiff's medications; however, those documents do not appear to be in the record.  (R. at 65.)  To the extent the ALJ's decision can be construed as considering the fifth factor, the ALJ mentioned Plaintiff's physical therapy and noted Plaintiff recuperated within the expected period of time.  (R. at 18.)  However, the ALJ failed to address the sixth or seventh factors set forth in 20 C.F.R. § 404.1529(c)(3).

Because the ALJ did not discuss the all the applicable factors set forth in 20 C.F.R. § 404.1529(c)(3)(i)-(vii) in making her credibility determination analysis, the ALJ has committed

legal error.  *See Grosse v. Comm'r of Soc. Sec.*, No. 08–CV–4137 (NGG), 2011 WL 128565, at

*5 (E.D.N.Y. Jan. 14, 2011) (finding that ALJ committed legal error by failing to apply factors

two through seven); *see also Valet v. Astrue*, No. 10–CV–3282 (KAM), 2012 WL 194970, at *22

(E.D.N.Y. Jan. 23, 2012) (remanding where ALJ failed to address all seven factors).

### 1.    Incomplete Portrayal of the Record

In addition to the ALJ's failure to completely review the 20 C.F.R. § 404.1529(c)(3)

factors, the ALJ's decision reflects an incomplete portrayal of the facts in the record.  "It is not

proper for the ALJ to simply pick and choose from the transcript only such evidence that

supports his determination, without affording consideration to evidence supporting the plaintiff's

claims."  *Sutherland v. Barnhart*, 322 F. Supp. 2d 282, 289 (E.D.N.Y. 2004) (citations omitted).

Instead, the ALJ must consider the entire record when making a determination as to the

claimant's disability.   *Id.*   Throughout her analysis, the ALJ selectively cited Plaintiff's

testimony to find that Plaintiff could perform the full range of sedentary work.  Notably, the ALJ

failed to include portions of Plaintiff's testimony regarding his limitations and restrictions

pertinent to an accurate understanding of Plaintiff's abilities.  *See Correale-Englehart*, 687 F.

Supp. 2d at 438 (noting that ALJ failed to discuss, *inter alia*, that plaintiff had to have someone

wash her hair and that she wore shoes that did not need to be tied); *see also Kuleszo v. Barnhart*,

232 F. Supp. 2d 44, 56 (W.D.N.Y. 2002) ("Although plaintiff testified that she did engage in

some of the activities of daily living mentioned by the ALJ in his decision, the ALJ fails to note

the limited fashion in which she undertook these activities.").

For example, in her factual findings, the ALJ noted Plaintiff's ability to drive locally, and

then stated, "[t]he last time he was on a bus[] or subway was over two to three years ago."  (R. at

13.)  However, the ALJ failed to mention that Plaintiff was unable to take public transportation

because he could not walk up and down the steps.  (R. at 34-35.)  The ALJ also did not acknowledge that Plaintiff moved to a new home because he could no longer walk up and down stairs.  (R. at 78.)  Furthermore, both the ALJ's summary of Plaintiff's testimony and her decision are not accurate reflections of the record.  In her summary of Plaintiff's testimony, the ALJ noted Plaintiff's testimony that he does not clean.  (R. at 14.)  However, the ALJ did not include Plaintiff's testimony that he does not clean because he is unable to stand for too long.  (R. at 71.)  The ALJ also stated that Plaintiff cooked, however, the ALJ failed to note Plaintiff's statement that his ability to cook is limited because of his inability to stand for too long.  (R. at 150.)

In assessing the daily activities Plaintiff was able to perform, the ALJ referenced Dr. Mescon's medical report from December 18, 2006 wherein Dr. Mescon noted Plaintiff, *inter alia*, showered, bathed, and dressed by himself.  (R. at 19, 238.)  However, the ALJ did not acknowledge Plaintiff's testimony that his son helped Plaintiff get dressed by tying his shoes for him.  (R. at 73.)  The ALJ also failed to note Plaintiff's difficulty with cleaning himself because the "toilet [was] too low."  (R. at 149-50.)   Finally, the ALJ failed to mention Plaintiff's testimony that he was unable to climb in and out of a tub, and that his ability to bathe himself was contingent upon having a stand-up shower.  (*Id.* at 79.)  Accordingly, because the ALJ did not consider the entire record before she made a credibility determination, the case is remanded. If after reviewing all of the evidence the ALJ still rejects Plaintiff's testimony, the ALJ is to explain why with sufficient specificity.

## 2.    Work History

Plaintiff also argues the ALJ failed to consider his 25-year work history when making her credibility determination.  (Pl.'s Mem. at 17-18.)  The Second Circuit recognizes that "a good

work history may be deemed probative of credibility." *Schaal*, 134 F.3d at 502; *Rivera v. Schweiker*, 717 F.2d 719, 725 (2d Cir. 1983) ("A claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability.") (citation omitted).  However, as the Commissioner asserted, the ALJ is not required to find a plaintiff's allegations credible based solely on a solid work history.  (*See* Reply Mem. of Law in Supp. of Def.'s Mot. for J. on the Pleadings and in Opp'n to Pl.'s Cross-Mot., Doc. Entry No. 13. ("Def.'s Reply") at 5.)  Instead, a plaintiff's work history is just one of several factors that the ALJ should consider in evaluating credibility.  *Schaal,* 134 F.3d at 502.

Nevertheless, despite Plaintiff's testimony that he has worked since he was fifteen years old (R. at 40), the ALJ failed to consider Plaintiff's work history at all as part of her credibility determination.  Instead, the ALJ only noted Plaintiff's work history in the facts of her decision, (R. at 14), which does not provide a sufficient assessment for a credibility determination.  *See Milien v. Astrue*, No. 10–CV–2447 (JG), 2010 WL 5232978, at *10 (E.D.N.Y. Dec. 16, 2010) (remanding where ALJ failed to acknowledge the existence of plaintiff's work history in credibility determination).  Accordingly, on remand the ALJ is to consider Plaintiff's work history as part of Plaintiff's credibility determination.

### C.    Work in the National Economy

Plaintiff argues the ALJ failed to meet her burden of showing Plaintiff can perform other work in the national economy.  (Pl.'s Mem. at 18-21.)  The Commissioner argues the ALJ properly applied the applicable medical vocational guidelines (the "Grids") in determining that there is other work in the national economy that Plaintiff can perform.  (Def.'s Reply at 5-7.)  The Court finds the ALJ erred in applying the Grids without properly developing the record regarding Plaintiff's non-exertional impairments or requiring the Commissioner to introduce

vocational testimony illustrating that jobs exist in the national economy in light of Plaintiff's non-exertional impairments.

Since Plaintiff established that he is unable to perform his past relevant work, the Commissioner had the burden to show that there are other jobs in the national economy that the Plaintiff is capable of performing.  *See Draegert*, 311 F.3d at 472 (citing *Carroll*, 705 F.2d at 642).  To meet this burden, the Commissioner may utilize the Grids, 20 C.F.R. Pt. 404 Subpt. P, App. 2.  *Rosa*, 168 F.3d at 78 (citing *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986)).  The Grids account for the claimant's residual functional capacity, age, education, and work experience.  *Id.* (citation omitted).  However, if the plaintiff suffers from non-exertional impairments[5] that "significantly diminish" the range of work permitted by his exertional limitations, then the application of the Grids is inappropriate.  *Bapp*, 802 F.2d at 605-06.  The term "significantly diminish" means "the additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity."  *Id.* at 606.  Where a plaintiff's work capacity is significantly diminished by non-exertional impairments rendering him unable to perform the full range of work indicated by the Grids, the ALJ must require the Commissioner to introduce vocational testimony or analogous evidence illustrating that jobs exist in the national economy that the Plaintiff could perform.  *Id.* at 605-06.

At step five, the ALJ considered the Plaintiff's age, education, past work experience, and residual functional capacity, in conjunction with the Grids and concluded that there are jobs in "significant numbers" in the national economy that Plaintiff could perform.  (R. at 19-20.)

---

[5] "A nonexertional limitation is one imposed by the claimant's impairments that affect her ability to meet the requirements of jobs other than strength demands, and includes manipulative impairments and pain."  *Sobolewski*, 985 F. Supp. at 310 (E.D.N.Y. 1997) (citing 20 C.F.R. § 404.1569a (a), (c)).

Plaintiff asserts that significant pain, limitations on his ability to bend, and his need to elevate his legs preclude him from performing the full range of sedentary work, and that the ALJ "mechanically" relied on the Grids without taking into these limitations into consideration. (Pl.'s Mem. at 18-19.)

According to the SSA's rulings, an inability to bend, stoop, crouch, or kneel more than occasionally would not substantially affect an individual's ability to perform light or sedentary work. *McDonaugh v. Astrue*, 672 F. Supp. 2d 542, 571 (S.D.N.Y. 2009) (citing SSR 85-15, 1985 WL 56857, at *2-3 (1985)). However, "[a] complete inability to stoop would significantly erode the unskilled sedentary occupation base and a finding that the individual is disabled would usually apply." *Molina v. Barnhart*, No. 04 Civ. 3201(GEL), 2005 WL 2035959, at *8 (S.D.N.Y. Aug. 17, 2005) (quoting SSR 96-9p, 1996 WL 374185, at *8 (July 02, 1996)). Here, the ALJ relied on the Grids despite the fact that the record has not been fully developed with respect to Plaintiff's exertional and non-exertional impairments. Moreover, Plaintiff's inability to bend, his consistent pain, and need to elevate his leg is noted throughout the record. On September 19, 2006, Dr. Gavrilova opined that Plaintiff could return to work on October 16, 2006, provided he did not bend his knees. (R. at 258.) As of December 18, 2006, Dr. Mescon documented Plaintiff's complaints of left knee pain and use of Vicodin. (R. at 238.) Additionally, Dr. Mescon documented Plaintiff's inability to squat all the way down. (R. at 239.) By January 19, 2007, Plaintiff experienced decreased range of motion and stiffness in his left knee. (R. at 250.) Though Dr. Gavrilova determined that Plaintiff could return to work on January 23, 2007, she did not opine on Plaintiff's ability to bend his knees as she had a few months earlier. (R. at 258.) However, on October 17, 2008, at the disability hearing, Plaintiff testified that he could neither bend nor squat because of his knee. (R. at 64.) Thus, the ALJ

should have obtained a medical opinion or required the testimony of a vocational expert to properly assess whether Plaintiff's ability to bend, his level of pain, and need to elevate his legs would preclude him from performing the full range of sedentary work before determining whether Plaintiff can perform other work in the national economy.

Plaintiff also argues that the ALJ failed to consider his obesity, a non-exertional impairment, when determining Plaintiff's ability to perform other work.  (Pl.'s Mem. at 19-21.) This argument is without merit.  As the Commissioner has noted, Plaintiff never claimed his obesity as one of his impairments when he applied for benefits or at any point throughout this administrative proceeding.  (*See* Def.'s Reply at 7.)  Nonetheless, "[a]n ALJ should consider whether obesity, in combination with other impairments, prevents a claimant from working." *Guadalupe v. Barnhart*, No. 04 CV 7644 HB, 2005 WL 2033380, at *6 (S.D.N.Y. Aug. 24, 2005) (citations omitted).  However, an ALJ's failure to explicitly address a claimant's obesity does not warrant remand.  *See id.* (citing *Rutherford v. Barnhart*, 399 F.3d 546, 552-53 (3d Cir. 2005); *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004)).

The court in *Guadalupe* found the ALJ "sufficiently, if somewhat indirectly, accounted for Plaintiff's obesity" when the ALJ noted the claimant's weight in his decision, but did not "spell-out whether this had any bearing on his determination" because the claimant "never mentioned her obesity [during the disability hearing] and her lawyer claim[ed] her obesity as an impairment for the first time before" the district court.  2005 WL 2033380, at *6.  Accordingly, the court in *Guadalupe* found the ALJ committed no error when he did not expressly consider the claimant's obesity in rendering his decision because the medical evidence before the ALJ made no mention of the obesity and the claimant did not discuss it during the disability hearing. *Id.*

Here, as in *Guadalupe*, Plaintiff raises the issue of obesity for the first time before this Court.  Also as in *Guadalupe*, while Plaintiff never mentioned his obesity during the disability hearing, the ALJ nevertheless sufficiently took note of Plaintiff's weight and weight gain during the hearing and when rendering her decision.  (*See, e.g.*, R. at 13, 15, 17, 32-33.)  Moreover, even though Plaintiff argues, for the first time on appeal, that his obesity is a non-exertional impairment affecting his ability to work, the medical record before the ALJ is devoid of any discussion of whether Plaintiff's weight impacted his ability to perform work-related functions. Instead, Dr. Gavrilova and Dr. Mescon only reference Plaintiff weight in the context of their routine examinations.  (*See, e.g.*, R. at 191, 239.)  Because Plaintiff only raises the issue of obesity for the first time on appeal and the medical record is devoid of evidence suggesting Plaintiff's obesity imposed any limitations on his ability to work, the Court finds the ALJ did not err when she did not consider Plaintiff's obesity when determining Plaintiff's ability to perform other work.  *See Martin v. Comm'r of Soc. Sec.*, No. 5:06-CV-720 (GLS/DEP), 2008 WL 4793717, at *14 (N.D.N.Y. Oct. 30, 2008) (acknowledging that plaintiff's medical records contain casual references to plaintiff's obesity but finding that "the record is wholly devoid of evidence to suggest that the condition imposes any limitations upon her ability to perform work-related functions.").

## CONCLUSION

For the reasons set forth above, the Commissioner's motion for judgment on the pleadings is denied.  Plaintiff's motion for judgment on the pleadings is granted.  Accordingly, pursuant to the fourth and sixth sentences of 42 U.S.C. § 405(g), the Commissioner's decision is reversed and the instant action is remanded for additional proceedings consistent with this opinion.  Specifically, the ALJ is directed to: (i) develop the record so as to adequately determine Plaintiff's RFC; (ii) thoroughly assess Plaintiff's credibility by addressing all of the relevant factors and considering the entire administrative record; and (iii) obtain relevant evidence to support the conclusion that there are other jobs in the national economy Plaintiff could perform, including the opinion of a vocational expert, if necessary.

SO ORDERED.

Dated: Brooklyn, New York
        September 11, 2012

                                                        _/s/_____
                                                        DORA L. IRIZARRY
                                                        United States District Judge